UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X
                                 :

BLAKE WINGATE,                          :

                         :

              Plaintiff,          :

                         :

        -against-                 :         14-cv-4063-ARR-LB

                         :

CITY OF NEW YORK; NEW YORK CITY   :   <u>NOT FOR ELECTRONIC</u>
CORPORATION COUNSEL; NEW YORK CITY   :   <u>OR PRINT PUBLICATION</u>
DEPARTMENT OF CORRECTIONS; WALLACE;   :
HALL; STANTON; DELAPHENA; FEASTER; BURKE;   :   <u>OPINION & ORDER</u>
CALDWELL; GREENE; JENKINS; BURDICK;   :
BROWN; PERRINO; JENNINGS; MATTHEWS;   :
CANTY; SCULLY; SMITH; PADMORE; JOHNSON;   :
ALL PROGRAMS CAPTAINS FOR OBCC, GRVC,   :
RNDC, AND AMKC,                   :

                         :

              Defendants.       :

                         :

------------------------------------------------------------------------- :
                         X

ROSS, United States District Judge:

        Pro se plaintiff Blake Wingate, currently incarcerated at Auburn Correctional Facility, brings

suit under 42 U.S.C. § 1983 alleging violations of his constitutional rights. Defendants now move for

summary judgment seeking dismissal of plaintiff's complaint in its entirety. For the reasons discussed

below, defendants' summary judgment motion is granted in part and denied in part.

## BACKGROUND

        In January 2014, plaintiff was arraigned on robbery and assault charges. He entered the

custody of the New York City Department of Correction ("DOC") as a pretrial detainee. Statement

of Material Undisputed Facts Pursuant to Local Civil Rule 56.1, at ¶ 1, ECF No. 222 ("56.1

Statement").[1] He then remained in city custody—mostly on Rikers Island—for the next eighteen

---

[1] Unless otherwise noted, plaintiff's response to defendant's 56.1 Statement does not meaningfully dispute the facts referenced here.

months.  Id. ¶¶ 37, 39.  During this time, he was housed at a number of facilities, including the Robert

N. Davoren Complex ("RNDC"), the Anna M. Kross Center ("AMKC"), the George R. Vierno

Center ("GRVC"), and the Otis Bantum Correctional Center ("OBCC").  Decl. of John L. Garcia in

Supp. of Defs.' Mot. for Summ. J. ("Garcia Decl."), Ex. L, ECF No. 224-14.[2]  In May 2015, plaintiff

was convicted of robbery and assault in the second degree.  56.1 Statement ¶ 38.  He was then

transferred to New York state custody in August 2015.  Id. ¶ 39.

   *Other Lawsuits.*  While in city custody, plaintiff filed five federal lawsuits.  56.1 Statement

¶¶ 23-36.  Four of those cases have been dismissed.  Id. ¶¶ 25, 27, 29, 33.  The remaining case, filed

in June 2014 (the third out of the five cases, chronologically), is the case at issue here.  Original Compl.,

ECF No. 1.

   The first case, Wingate v. Quattrochi, No. 14-cv-2666 (ARR), alleged improper conduct in

plaintiff's state habeas proceedings, as well as—at Rikers—the denial of a special allergy diet, exposure

to methane gas, and work without minimum-wage pay.  2014 WL 2091245, at *1 (E.D.N.Y. May 15,

2014).  That case was dismissed under 28 U.S.C. § 1915A(b), based on judicial and prosecutorial

immunity, Younger abstention, and failure to state a claim.  Id. at *2-4.  Plaintiff's claim that he was

subjected to "some unidentified harm" after being exposed to methane gas on Rikers was dismissed

because it was conclusory.  Id. at *4.  His minimum wage claim was dismissed because he was not an

employee within the meaning of the Fair Labor Standards Act.  Id.  And his claim that he was denied

his medical diet was dismissed without prejudice because he had not alleged sufficient facts to support

such a claim, and had referred to exhibits "that were not included in his submission to the court."  Id.

   The second case, Wingate v. City of New York, No. 14-cv-4007 (ARR), alleged that plaintiff

had not been paid minimum wage for his work as a pretrial detainee under New York State and City

Human Rights Law.  2014 WL 3747641, at *1 (E.D.N.Y. July 25, 2014).  It also alleged that he had

---

[2] The exhibit cover page for this exhibit says "Exhibit M," but it is Exhibit L.

been denied access to the law library and had his outgoing mail blocked.  Id. at *1-2.  The state and city wage claims were dismissed for lack of subject-matter jurisdiction.  Id. at *2.  The mail and library claims were dismissed against the city for failure to allege a policy or practice under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978).  2014 WL 3747641, at *2.  And the mail and library claims were dismissed against the individual defendants without prejudice, because essentially identical claims were being made in the present case (No. 14-cv-4063).  Id. at *3.

The third case, Wingate v. City of New York, No. 14-cv-4063 (E.D.N.Y.), is the suit at issue here.

The fourth case, Wingate v. City of New York, No. 14-cv-4316 (ARR), alleged again that plaintiff had been denied access to the law library.  2014 WL 3747662, at *1 (E.D.N.Y. July 25, 2014).  It also alleged that his prison classification had been changed without due process.  Id.  The classification claim was dismissed because plaintiff did not have a liberty interest in a particular prison classification.  Id.  The law library claims were handled in the same way they were in 14-cv-4007: the claim against the city was dismissed for failure to allege a policy or practice, and the claims against the individual defendants were dismissed without prejudice as duplicative of the claims in the present case.  Id. at *2.

The fifth case, Wingate v. City of New York, No. 14-cv-6343 (S.D.N.Y. Apr. 16, 2015), alleged that the air conditioning was broken in the heat-sensitive housing unit at GRVC in early July 2014, causing him to black out.  Compl. 3, ECF No. 2.  The court issued an order to show cause why plaintiff's request to proceed in forma pauperis ("IFP") should not be denied under 28 U.S.C. § 1915(g), for having three or more of prisoner cases dismissed on the grounds that they were frivolous, malicious, or failed to state a claim.  Order to Show Cause, ECF No. 10.  Although plaintiff submitted three letters in response, the court concluded that he was barred from further IFP suits based on his litigation history.  See Affirmation Opposing Proposed Bar Order and Letters, ECF Nos.

11-13; Bar Order Under 28 U.S.C. § 1915(g), ECF No. 14. It therefore issued a bar order preventing him from filing more suits unless he paid the filing fee or was "under imminent threat of serious injury." Bar Order 3 & n.1.

*Plaintiff's Mail.* Plaintiff frequently mailed letters—legal and otherwise—during his time in city custody. At least some of this outgoing mail, he alleges, was improperly delayed by DOC employees. See, e.g., Garcia Decl. Ex. A 41, 45, ECF No. 224-1 ("Am. Compl.").[3]

According to plaintiff, Hall, Wallace, Stanton, and Delaphena all "refused to post [plaintiff's Inmate Liaison Committee ("ILC")] mail and his legal mail." Id. at 21-22. In reference to Delaphena's refusal to deliver his mail, plaintiff alleges that this caused him to "suffer[] great losses because he could not get the mail out and receive responses for . . . his court cases civil and criminal." Id. at 22. On multiple occasions, plaintiff states, bundles of mail were returned to plaintiff by defendants. E.g., id. at 21 (Wallace gave fifty pieces of legal and ILC mail to another inmate to give back to plaintiff); id. at 22 (Stanton gave plaintiff thirty letters that the mailroom had held for ten days but refused to post); see Garcia Decl. Ex. M 97-98, ECF No. 224-15 ("Wingate Dep.") (stating that Wallace returned 150 pieces of mail to him and Stanton returned 101 pieces of mail to him). According to plaintiff, Johnson, Feaster, Greene, and Burke refused to send his mail out at AMKC, while Wallace, Hall, Stanton, and Delaphena refused to send out his mail at RNDC. Wingate Dep. 196-98.[4]

In addition, DOC employees—specifically Thomas Scully and the mail room employees in RNDC—allegedly froze his spending account from March to May 2014. Wingate Dep. 181-84. This, plaintiff says, prevented him from buying anything at the commissary, including stamps. See Am.

---

[3] Because plaintiff's amended complaint was uploaded in three separate documents (ECF Nos. 65 through 65-2), I cite to the copy attached as Exhibit A to defendants' summary judgment motion and to the ECF pagination therein.

[4] Plaintiff had also initially named a C.O. Smith from AMKC as a defendant but he withdrew his claim against him on the record during a telephone conference on June 2, 2016. Order, ECF No. 123 (stating that "[p]laintiff withdrew his claim against C.O. Smith . . . on the record").

Compl. 25; Wingate Dep. 177-83. Plaintiff alleges that his account was frozen as a form of harassment or retaliation for filing grievances and "send[ing] out too much mail." Wingate Dep. 182. Plaintiff's inmate transaction list indicates that he spent at least some money at the commissary and on postage in March and April of 2014. Garcia Decl. Ex. J, at D90-D92, ECF No. 224-11 ("Defs.' Ex. J"). On April 23, he spent the last of the money in his account. Id. at D92. He then carried a balance of zero dollars until May 28, when he received a deposit of two hundred dollars. Id.

Plaintiff's complaint focuses on his outgoing mail, but he does allege at least one instance in which he had a problem with his incoming mail. Am. Compl. 18. In 2012, when plaintiff was at OBCC on a different charge, plaintiff allegedly asked someone named Victor Romain to mail him medical information "in relation to . . . three cases" that would "show why [plaintiff] had not completed . . . an order to complete community services." Id. According to plaintiff, Romain received a certified return receipt and correction staff signed for the mail, but plaintiff never received it. Id. He therefore "had no other alternative [than] to cop out to the charges of the 3 consolidated cases." Id. In his deposition, plaintiff also stated that, while at RNDC, some of his incoming mail was not delivered, although he could not say what mail or how much. Wingate Dep. 109-13.

According to plaintiff, wardens and deputy wardens at GRVC and RNDC (Matthews, Canty, Perrino, and Jennings) were informed of the mail issues, but Canty and Matthews "did nothing to stop" it and Perrino and Jennings "basically backed" it. Am. Compl. 24, 31.

Defendants respond that they handled plaintiff's mail in accordance with DOC Directive No. 4001R-B, which lays out DOC policy on inmate mail. Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. 3, ECF No. 221 ("Defs.' Mot."); Garcia Decl. Ex. C, ECF No. 224-4 ("Defs.' Ex. C"). When an inmate is indigent—meaning he has no funds in his commissary account—DOC will provide him with "free stationery, envelopes and first class postage for all letters to attorneys, courts and public officials." Defs.' Ex. C at 7. In addition, an indigent inmate may send two free personal letters each

week.  Id.  While the personal letters must each weigh no more than two ounces, there is no weight limit on legal mail.  Id.  Non-indigent inmates must pay for their own postage.  Id.  According to defendants, plaintiff's legal mail was given to the postal service for delivery regardless of how much money was in his account, and his other mail was sent out if he had enough money in his account or if it met the conditions for free personal mail for indigent inmates.  Defs.' Mot. 4.[5]  Plaintiff's account had less than a dollar in it on multiple occasions during his time at Rikers.  E.g., Defs.' Ex. J, at D89-D90, D92, D97.  Defendants make no statement about plaintiff's incoming mail except to say that "[p]laintiff is not alleging that he was not timely receiving his mail."  Defs.' Mot. 8.

*Library Access.*  Plaintiff also asserts that defendants Jenkins, Caldwell, and Burdick improperly limited his library access at RNDC from February to June 2014.  Am. Compl. 22-23, 28; see also Wingate Dep. 125, 202-04.  On multiple occasions, he says, defendants caused plaintiff's two-hour library sessions to end early and denied him extra time in the library.  Am. Compl. 22-23, 28; see also Wingate Dep. 117-18.  "Extra time," as plaintiff described it, "is when you use your normal period and then you request more time for court deadlines."  Wingate Dep. 120.  According to plaintiff, he was denied extra time several times.  Id.  Defendants' actions, plaintiff alleges, caused him to miss at least three court deadlines.  Am. Compl. 22-23; see also id. at 28 (stating that, as a result of problems with the law library, plaintiff "again could not make court deadlines in Brooklyn and Queens Court").  At this time, plaintiff testified that he had multiple active criminal cases, and that they were all dismissed except for the robbery for which he was incarcerated.  Wingate Dep. 129.

---

[5] Defendants cite to the following records to support this claim: Garcia Decl. Ex. D (RNDC Logbook for Indigent Mail from Feb. 25, 2014 to Apr. 17, 2014 and Dec. 10, 2014 to May 19, 2015), ECF No. 224-5 ("Defs.' Ex. D"); Garcia Decl. Ex. E (Rikers Island Central Cashier ("RICC") Logbook for Indigent Outgoing Legal Mail from Mar. 8, 2014 to Apr. 30, 2014), ECF No. 224-6 ("Defs.' Ex. E"); Garcia Decl. Ex. F (RICC Logbook for Outgoing Mail from Mar. 19, 2014 to Oct. 3, 2014), ECF No. 224-7 ("Defs.' Ex. F"); Garcia Decl. Ex. H (GRVC Logbook for Indigent Mail from Apr. 17, 2014 to July 22, 2014), ECF No. 224-9 ("Defs.' Ex. H"); Garcia Decl. Ex. I (AMKC Logbook for Legal Mail from Aug. 28, 2014 to Nov. 19, 2014), ECF No. 224-10 ("Defs.' Ex. I").

*Heat in Cell.*  Plaintiff lived at GRVC from April 17 to July 23, 2014.  56.1 Statement ¶ 19. According to plaintiff, the air conditioning broke in early July causing him to black out from the heat. Am. Compl. 32; cf. Wingate Dep. 210.[6]  After plaintiff was found unconscious in his cell, he was taken to the showers to cool off.  Wingate Dep. 210-12.  In his deposition, plaintiff testified that he asked to see a doctor that day but an officer named Ramos would not take him.  Id. at 212.  A day after he blacked out, plaintiff alleges, another inmate also passed out from the heat.  Am. Compl. 32; Wingate Dep. 211.  Plaintiff states that he did not go to the clinic until later that week or the week after. Wingate Dep. 213.  At some point after his collapse, he says, he was moved to a "proper" heat-sensitive unit.  Id.  Plaintiff's medical records dated July 12, 2014 state: "[patient] allegedly complain of too hot in the cell / [patient] is already in heat sensitive housing."  Garcia Decl. Ex. K, at DEF2113, ECF No. 224-12 ("Defs.' Ex. K").  The same record says that DOC was "to bring [patient] to clinic / [patient] not produced."  Id.

*Procedural Background.*  Plaintiff filed the present case in June 2014, and his operative complaint in March 2015.  Am. Compl. 57.  Primarily, he alleges that defendants denied him access to the courts and violated his First Amendment rights by interfering with his mail and by limiting his time in the law library.  Id. at 5.  He also alleges that defendants treated him with deliberate indifference when they allowed his cell to overheat.  Id. at 31.  And finally, he alleges that all defendants retaliated against him for filing grievances and lawsuits.  Id. at 3.  In 2017, plaintiff sat for a deposition that took place over six nonconsecutive days.  Wingate Dep. 1, 69, 83, 144, 233.  In April of this year, defendants moved for summary judgment on all claims.  Defs.' Mot. 6.

---

[6] According to an email from Dale Wilker (an attorney at the Legal Aid Society) to Rikers medical staff, plaintiff told Wilker that he and another inmate passed out from the heat in GRVC on July 3, 2014 and July 4, 2014, respectively.  Pl.'s Opp'n to Defs.' Summ. J. Mot., Ex. AA 301, ECF No. 240-1 ("Pl.'s Ex. AA").

# DISCUSSION

For the reasons discussed below, I grant summary judgment to all defendants on plaintiff's access-to-the-courts claim (based on both his mail and library allegations), on plaintiff's deliberate indifference claim stemming from the heat in his cell, and on plaintiff's retaliation claim. Furthermore, I grant summary judgment on all of plaintiff's claims as to the following defendants: Corporation Counsel, the DOC, the City of New York, Perrino, Jennings, Matthews, Canty, Brown, Smith, Padmore, Jenkins, Caldwell, and Burdick. I deny summary judgment as to plaintiff's First Amendment interference-with-mail claim. The sole remaining claim, therefore, is his First Amendment claim against defendants Feaster, Greene, Burke, Wallace, Hall, Stanton, Delaphena, Scully, and Johnson. All other claims and defendants are dismissed.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and that he or she "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "can affect the outcome under the applicable substantive law." Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In performing this analysis, I must resolve all ambiguities and draw all inferences in favor of the non-moving party. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). "If, in this generous light, a material issue is found to exist, summary judgment is improper." Nationwide Life Ins. Co v. Bankers Leasing Ass'n, 182 F.3d 157, 160 (2d Cir. 1999) (quoting Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985)).

The moving party may show that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo, 22 F.3d at 1223-24 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial."

LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (citations omitted) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), and F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010)). If "no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment must be granted." Id. (quoting Great Am. Ins. Co., 607 F.3d at 292).

It is "the duty of district courts not to weigh the credibility of the parties at the summary judgment stage." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005). However, "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory or incomplete," a judge may conclude that "no reasonable person could believe [plaintiff's] testimony." Id. at 554-55. In such a situation—where there is a lack of other direct evidence and the testimony at issue is "replete with inconsistencies and improbabilities"—it is not error to grant summary judgment. Id. at 555. At the same time, I must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). This is particularly true when a plaintiff's claims may be subject to final dismissal, as on a summary judgment motion. Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

I. **I grant defendants' summary judgment motion as to plaintiff's access-to-the-courts claims, because there is no genuine dispute that he has not been injured by defendants' alleged conduct.**

Defendants' summary judgment motion is granted as to plaintiff's access-to-the-courts claims, because no reasonable fact-finder could conclude that plaintiff has been injured by the alleged interference with his mail or with his access to the law library.

"[P]risoners have a constitutional right of access to the courts." <u>Bounds v. Smith</u>, 430 U.S. 817, 821 (1977). They must therefore be provided with "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." <u>Id.</u> at 825. "It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents . . . and with stamps to mail them." <u>Id.</u> at 824-25. Relatedly, an inmate has the right to send and receive legal mail, <u>Washington v. James</u>, 782 F.2d 1134, 1139 (2d Cir. 1986), and to access legal materials, <u>Collins v. Goord</u>, 581 F. Supp. 2d 563, 573 (S.D.N.Y. 2008). To hold a defendant liable for violating this right, however, plaintiff must show that defendants' conduct was deliberate and malicious. <u>Collins</u>, 581 F. Supp. 2d at 573 (citing <u>Davis v. Goord</u>, 320 F.3d 346, 351 (2d Cir. 2003)). Further, to have standing to bring an access-to-the-courts claim, plaintiff must allege that he has actually been injured by defendants' conduct. <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1996). Plaintiff must therefore "show that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." <u>Id.</u>; <u>Benjamin v. Fraser</u>, 264 F.3d 175, 184 (2d Cir. 2001). Unless he can "demonstrate that [his] nonfrivolous legal claim" has been "frustrated or . . . impeded," plaintiff lacks the kind of stake in the litigation required by Article III. <u>See Lewis</u>, 518 U.S. at 352-53.

Here, plaintiff has failed to provide any evidence—or even make more than conclusory allegations—that would support a finding of actual injury based on defendants' alleged mishandling of his mail. His four other civil cases were all dismissed for reasons unrelated to any missed deadlines or absent filings from plaintiff. <u>Wingate v. Quattrochi</u>, No. 14-cv-2666, for example, was dismissed on immunity and abstention grounds, as well as failure to state a claim. No correspondence or documentation could have overcome the deficiencies of the claims dismissed from this case with prejudice.[7] Plaintiff's other cases in front of me, <u>Wingate v. City of New York</u>, Nos. 14-cv-4007 and

_____
[7] Plaintiff's medical diet claim was dismissed without prejudice for failure to allege sufficient facts. And while I mentioned in my opinion that plaintiff had referred to exhibits that had not been submitted to the court, that

14-cv-4316, were dismissed either for reasons that could not have been remedied by plaintiff or were dismissed without prejudice because they were essentially duplicative to the present suit. E.g., 2014 WL 3747641, at *1 (dismissing plaintiff's state and city wage claims for lack of subject-matter jurisdiction); id. at *3 (dismissing plaintiff's mail and library claims without prejudice as duplicative). Plaintiff's final civil case, Wingate v. City of New York, No. 14-cv-6343, was dismissed because plaintiff's litigation history precluded his request to proceed IFP. No correspondence from plaintiff could have averted this outcome and, in any event, the court did receive and consider an opposition and two additional filings from plaintiff in rendering its decision.

All of plaintiff's criminal cases that were pending during his time at Rikers were dismissed (except for the conviction on which he is currently incarcerated), according to his own testimony. Wingate Dep. 129, 158.[8] As to the charge for which he was tried and found guilty, plaintiff again provides no evidence—and makes no more than conclusory allegations in his complaint—that any issues with his mail or denial of time in the law library had any effect on the outcome of that case. Id.; see also Am. Compl. 25-26.

Finally, plaintiff has suffered no actual harm in the present civil case from his alleged mail and library issues. Although he has missed deadlines, I have not considered that fact in any way in rendering my decision here. I have received all of plaintiff's summary judgment papers, including his exhibits, as well as many letters from plaintiff throughout the course of the litigation. To the extent

---

absence was not dispositive. Nor was plaintiff prevented from attempting to present such a claim in a new suit, as he has done here.

[8] Plaintiff does allege that the denial of his incoming mail caused him prejudice in an unidentified case relating to his obligation to complete community service. Am. Compl. 18 (alleging that the non-delivery of a package of medical information required him to "cop out to the charges of the 3 consolidated cases"). But plaintiff provides absolutely no support beyond this conclusory allegation such that a fact-finder could conclude that this event, if it occurred, caused plaintiff actual injury. Nor does plaintiff provide any evidence that the alleged non-delivery was deliberate or malicious.

that he has had trouble sending or receiving mail or accessing the law library, it has not prejudiced him in this case.

Because no reasonable fact finder could find in favor of plaintiff on the issue of actual injury, I conclude that defendants are entitled to summary judgment on plaintiff's access-to-the-courts claim. This claim is therefore dismissed as to all relevant individual defendants—Wallace, Hall, Stanton, Delaphena, Feaster, Greene, Burke, Caldwell, Johnson, Scully, Jenkins, Caldwell, and Burdick. Jenkins, Caldwell, and Burdick are dismissed from the case entirely, as the only allegations against them relate to plaintiff's access-to-the-courts claim based on his law library allegations.

## II. I deny defendants' summary judgment motion as to plaintiff's First Amendment claim, because there is a genuine dispute over whether there was an ongoing practice by prison officials of interference with his mail.

Defendants' summary judgment motion is denied as to plaintiff's First Amendment claim, because there is a dispute of material fact over whether there was an ongoing practice by prison officials of interfering with plaintiff's mail.

Prisoners have a "right to the free flow of incoming and outgoing mail" under the First Amendment. Davis, 320 F.3d at 351; accord Johnson v. Goord, 445 F.3d 532, 534 (2d Cir. 2006). "Restrictions on prisoners' mail are justified only if they 'further[] one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" Davis, 320 F.3d at 351 (quoting Washington, 782 F.2d at 1139)). Because of the interests at stake, "courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." Id. To show a violation of this First Amendment right, plaintiff must demonstrate that prison officials established an ongoing practice of interfering with his mail or that he suffered harm caused by the mail tampering. Id. at 351-52.

Defendants argue that they are entitled to summary judgment because they consistently processed plaintiff's mail pursuant to the DOC Directive. In support, defendants cite to mail room logbooks from RNDC, GRVC, AMKC, and RICC, which contain entries representing outgoing mail items sent by plaintiff. Defs.' Mot. 8; Defs.' Exs. D-F, H-I; see also, e.g., Defs.' Ex. D, at DEF44. These logbooks do not conclusively prove, however, that all of plaintiff's mail was being processed according to the DOC Directive. In fact, it seems plausible that, to the extent plaintiff's mail was being improperly delayed or returned to him, those unsent letters would not appear on the logbooks at all.

Defendants also argue that plaintiff's claim cannot survive because he does not understand the DOC Directive. Defs.' Mot. 14. First, they say, plaintiff believed—at least at one point—that indigent inmates could send out unlimited mail. Id.; Wingate Dep. 50 ("If you don't have money in your account, the facility pays for your mail."). It is not clear, however, whether plaintiff was referring to all mail or just legal mail when he made that statement. And, as defendants acknowledge, plaintiff did express an accurate understanding of the DOC Directive later in his deposition. Wingate Dep. 100. Second, defendants argue that plaintiff misunderstands the DOC Directive's definition of legal mail. Defs.' Mot. 14. That is supported by plaintiff's deposition, in which he stated that he understood legal mail to mean "[m]ail of which is sent to a family member as well as to the courts, senators, President of the United States, governor, city, state, [and] federal agencies." Wingate Dep. 101. But this does not preclude the possibility that some of plaintiff's actual legal mail was being improperly delayed or withheld.

Assuming defendants have met their initial burden, I conclude that plaintiff has come forward with sufficient factual support to survive a motion for summary judgment on this issue. Plaintiff testified at length in his deposition about his mail being delayed or improperly returned to him. He also testified that at least for some period of time, he had money in his commissary account but was

not permitted to spend it, which meant that he could not buy postage or make use of the policy for indigent mail. Wingate Dep. 181-84.[9] Where, as here, plaintiff's testimony is not "replete with inconsistences and improbabilities," it would be inappropriate for me to engage in a credibility determination at the summary judgment stage. See Jeffreys, 426 F.3d at 555. Moreover, plaintiff's allegations are supported by his contemporaneous communications with staff attorneys at the Legal Aid Society, in which he made the same or similar mail-related allegations. E.g., Pl.'s Ex. AA 299, 305-06, 309-10, 313-14, 316. In sum, a reasonable fact finder could conclude that there was an ongoing practice of interference with plaintiff's mail.[10]

The individual defendants also argue that, even if plaintiff's rights were violated, they are entitled qualified immunity on the basis that they merely followed the guidance of the DOC Directive. Defs.' Mot. 16-17. But, as discussed above, plaintiff has established a material dispute of fact as to whether the defendants actually did follow the DOC Directive. His position, supported by at least some evidence, is that they did not. I therefore cannot conclude at this stage that defendants are entitled to qualified immunity on plaintiff's First Amendment mail-interference claim.

## III. I grant defendants' summary judgment motion as to plaintiff's deliberate indifference claim, because he has failed to allege the involvement of any specific defendant.

Defendants' summary judgment motion is granted as to plaintiff's deliberate indifference claim based on his allegations relating to the heat in his cell, because has not identified the individual or

---

[9] Defendants argue that plaintiff's account was never frozen—he simply carried a balance of zero dollars for all of the relevant time period (April to June 2014). Defs.' Mot. 11. It is true that plaintiff had no money in his account from April 23 to May 28. Ex. J, at D92. But beginning May 28, he had at least two hundred dollars in his account. Id. He did not spend any of that money at the commissary or on postage until June 5. Id. at D93. As one of plaintiff's summary judgment exhibits shows, the Legal Aid Society—in response to a complaint from plaintiff about this issue—had emailed the prison on June 4 asking them to allow plaintiff to access the funds in his account. Pl.'s Ex. AA 294. In sum, although plaintiff may have misremembered the length of time his account was frozen, I cannot conclude at the summary judgment stage that it did not occur at all. I therefore decline to grant defendants' summary judgment motion as to defendant Scully, who plaintiff identified as the perpetrator of the account freezing.

[10] I discuss plaintiff's allegation that Perrino and Jennings created a policy that required inmates to be indigent for thirty days before they could send free mail in Section V.B, below.

individuals who engaged in the alleged offending conduct.[11]

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017). Because pretrial detainees have not been convicted of a crime, they "may not be punished in any manner—neither cruelly and unusually nor otherwise." Id. (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)).

To "establish a § 1983 claim for allegedly unconstitutional conditions of confinement," plaintiff must "show[] that the [defendants] acted with deliberate indifference to the challenged conditions." Id. There are two prongs to such a claim—an objective prong and a subjective prong. First, plaintiff must "show[] that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process." Id. And second, plaintiff must "show[] that the officer acted with at least deliberate indifference to the challenged conditions." Id. On the objective prong, the conditions must "pose an unreasonable risk of serious damage to [the inmate's] health." Id. at 30. The Second Circuit "has been reluctant to impose bright-line durational or severity limits in conditions of confinement cases, and has never imposed a requirement that pretrial detainees show that they actually suffered from serious injuries." Id. at 31. The determination is a fact-intensive one. Id. On the subjective prong, defendant must have "acted intentionally to impose the alleged condition," or have "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Id. at 35.

---

[11] Plaintiff's claims that he was denied a special medical diet at Rikers and that he was exposed to methane gas at Rikers (to the extent he is making such claims) are denied for the same reasons. Am. Compl. 26, 35, 40; e.g., Wingate Dep. 140-41, 222 (medical diet); Wingate Dep. Aug. 23, at 82 (mentioning only a "Ms. Talusan" as someone who "refused to give [him his] diet . . . in 2014"); Wingate Dep. 214, 216-21 (methane gas).

Plaintiff alleges that his cell at GRVC was overly hot on at least one day in July 2014, causing him to black out. Am. Compl. 32; Wingate Dep. 210. He does not, however, allege that any particular defendant was deliberately indifferent to the heat. Such a claim cannot proceed. See Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993) (per curiam) ("Greater accuracy and specificity are required of even *pro se* plaintiffs faced with a motion for summary judgment."); accord Ba v. N.Y.C. Police Dep't, 99-cv-11984GELHBP, 2001 WL 1098019, at *5 (S.D.N.Y. Sept. 19, 2001).[12]

## IV. I grant summary judgment to defendants on plaintiff's retaliation claim, because he has not established that his protected conduct was a motivating factor for any of defendants' alleged actions.

Read generously, plaintiff's complaint alleges that defendants retaliated against him for filing lawsuits and grievances.[13] Am. Compl. 4; see also Wingate Dep. 182-83 (stating that his commissary account was frozen to "harass[]" him and "retaliate[]" against him for the grievances he filed). I grant summary judgment to defendants on this claim.

To establish a claim for retaliation under § 1983, plaintiff has the initial burden of showing that the conduct prompting the retaliation "was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison official's decision to" take the retaliatory action. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (citing Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)). "A claim of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone." Id. (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)). Plaintiff's claim of retaliation is, in fact, wholly conclusory. While his lawsuits and grievances were constitutionally

---

[12] The only individual plaintiff has identified in connection with this event is an Officer Ramos, who allegedly refused to take plaintiff to the clinic after he passed out, instead directing him to stay in the showers, where he was already cooling off. Wingate Dep. 212. Ramos is not a defendant in this suit. Even if she were, however, plaintiff has presented no evidence—or even allegations—that she knew about the heat in his cell before he passed out or that her refusal to take him to the clinic after posed an unreasonable risk of serious damage to plaintiff's health.

[13] Plaintiff does not allege that any specific defendants retaliated against him. Reading his complaint generously, however, I assume that he intends it to refer to the mail room staff who allegedly interfered with his mail.

protected, <u>see id.</u> at 80, plaintiff has not alleged, except in the most general manner, that his protected conduct was a substantial factor in defendants' alleged interference with his mail or in any other of their actions towards him. Nor has he come forward with any evidence that would support such a conclusion.

Although defendants have moved for summary judgment on the entire amended complaint, Defs.' Mot. 26, they do not discuss plaintiff's retaliation claim in their memorandum in support of their motion. Nevertheless, I conclude that summary judgment against plaintiff is appropriate here. Sua sponte summary judgment is generally improper "where no party has moved for summary judgment and no notice was given by the court." <u>Pugh v. Goord</u>, 345 F.3d 121, 125 (2d Cir. 2003). But when "it is clear that all of the evidentiary material a party might submit is before the court" and plaintiff was "on notice that [he] had to come forward with all of [his] evidence," sua sponte summary judgment may be appropriate. <u>See</u> <u>Pugh</u>, 345 F.3d at 124 (quoting <u>First Fin. Ins. Co. v. Allstate Interior Demolition Corp.</u>, 193 F.3d 109, 114 (2d Cir. 1999)). Here, defendants' notice of motion and memorandum in support both state that they seek dismissal of the amended complaint in its entirety. Plaintiff—even as a pro se litigant—would therefore have been aware that his entire suit was at stake in this motion. Moreover, the volume of plaintiff's summary judgment submissions—over 2,000 pages of briefs and exhibits—strongly suggests that he understood that he must come forward with all of his evidence and that anything he might submit is now before the court. Summary judgment is therefore proper here.

## V. I grant summary judgment on all claims to defendants Corporation Counsel, the DOC, the City of New York, Perrino, Jennings, Canty, Matthews, Brown, Smith, and Padmore.

I grant defendants' summary judgment motion as to plaintiff's claims against the New York City Corporation Counsel, the DOC, and the City of New York, as well as individual defendants Perrino, Jennings, Canty, Matthews, Brown, Smith, and Padmore.

**A. I grant summary judgment to Corporation Counsel and the DOC on all claims, because they are not suable entities.**

Plaintiff's claims against Corporation Counsel and the DOC are dismissed because they are not suable entities. N.Y.C. Charter ch. 17, § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law."); Toliver v. N.Y.C. Dep't of Correction, No. 10-cv-6666(RJS)(JCF), 2012 WL 3999316, at *4 (S.D.N.Y. Apr. 3, 2012), R. & R. adopted, 2012 WL 4017298 (DOC not suable); Lumpkin v. N.Y. Police Department, No. 13-cv-7227(CBA)(LB), 2014 WL 726780, at *2 (E.D.N.Y. Feb. 24, 2014) (Corporation Counsel not suable).

**B. I grant summary judgment to the City of New York, because plaintiff has not established that there was a policy, custom, or practice that deprived him of a constitutional right.**

Plaintiff's claims against the City of New York are dismissed because plaintiff has failed to allege a policy, custom, or practice such that the city can be held liable under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

Municipalities sued under § 1983 "cannot be held liable . . . on a *respondeat superior* theory." Monell, 436 U.S. at 691. Only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" can the city be held liable. Id. at 694. A policy may take the form of an official policy or it may take the form of a decision or ratification by an official who is responsible for establishing municipal policy. Pembaur v. City of Cincinnati, 475 U.S. 469, 482 (1986) (plurality opinion); City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion). Alternatively, it may take the form of a practice that, while not officially "approved by an appropriate decisionmaker[,] . . . is so widespread as to have the force of law." Bd. of Cty. Commr's v. Brown, 520 U.S. 397, 404 (1997). Finally, even if there is no policy, a municipality may be held liable if policy-makers failed to train or supervise their employees to such an extent that it "amounts to deliberate indifference" to the

constitutional rights of the individuals who come into contact with those employees. <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989).

Here, plaintiff has failed to provide evidence—or anything beyond conclusory allegations, Am. Compl. 41-42—that would support liability under any of these theories. Although he has come forward with enough support to survive summary judgment on his First Amendment claim, <u>see</u> Section II, he has not established a policy or practice within the meaning of <u>Monell</u>. An ongoing practice of interference with plaintiff's mail is not necessarily a practice "so widespread as to have the force of law." Even plaintiff's version of the facts does not rise to that level. Nor has plaintiff provided any support for his conclusory allegations that "the city failed to proper[ly] discipline and train their staff on all levels." Am. Compl. 42. "'[D]eliberate indifference' is a stringent standard of fault," <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2001) (quoting <u>Brown</u>, 520 U.S. at 410), and a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," <u>id.</u> Plaintiff's claim cannot survive under this standard.

Finally, plaintiff's allegation that Warden Perrino and Deputy Warden Jennings created a policy that required inmates to be indigent for thirty days before they could send free mail (Am. Compl. 23-24) is not sufficient to support municipal liability at the summary judgment stage. Even assuming Perrino and Jennings are policy-makers under <u>Monell</u>,[14] there is no factual support in the record that this policy existed or that Perrino and Jennings created it. According to plaintiff, the thirty-day policy was memorialized in the March 17, 2014 Inmate Council meeting minutes. Am. Compl. 23. I have not been able to find a copy of those minutes in the record, either attached to plaintiff's amended

---

[14] In any event, it is doubtful that either Perrino or Jennings is a policy-maker under <u>Monell</u>, because neither "speak[s] with final policymaking authority . . . concerning the action[s] alleged." <u>See</u> <u>Jett v. Dallas v. Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989); <u>see also</u> <u>Praprotnik</u>, 485 U.S. at 127 (plurality opinion) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinates departures from them, are the act of the municipality."). The Board of Correction is the entity with that authority—it is the body that establishes Minimum Standards for the prison, including the DOC Directive regarding inmate mail at issue in this case.

complaint or to his summary judgment operation. Moreover, plaintiff's transaction list and the mail logbooks show that he sent outgoing mail on March 18, 2014, when he had only been indigent for a day. Defs.' Ex. J, at D90; Defs.' Ex. E, at DEF23. Thus, to the extent plaintiff bases his claim for municipal liability on Perrino or Jennings' alleged actions, such a claim cannot survive.

### C. I grant summary judgment to Perrino, Jennings, Canty, Matthews, Brown, Smith, and Padmore, because plaintiff has not established that they were sufficiently involved in the alleged misconduct.

Plaintiff's claims against Perrino, Jennings, Canty, Matthews, Brown, Smith, and Padmore are dismissed for lack of personal involvement. Even taking plaintiff's version of the facts, he has not alleged a claim against any of these defendants. A defendant must be personally involved in the alleged constitutional violation to be held liable under § 1983. Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009). There is no supervisory liability—each individual "is only liable for his or her own misconduct." Id. at 677.

#### 1. *Matthews, Canty, Perrino, and Jennings*

Plaintiff alleges that Matthews—the deputy warden in charge of the special housing unit at GRVC—"refused to issue any orders to stop the harassment of the deponent in the mail, account and all other issues thereof." Am. Compl. 31. According to plaintiff, Matthews was "personally addressed," as was Canty (the warden of GRVC), "[a]nd they did nothing to stop the disturbing and unconstitutional mishandling of the mails." Id. In a similar vein, plaintiff alleges that Perrino and Jennings "basically backed all of the illegal and improper applications of the Postal directives." Am. Compl. 24; see Wingate Dep. 46-48. These conclusory allegations cannot support individual liability against any of these four defendants. Nor can plaintiff's allegation that Perrino and Jennings established a policy requiring inmates to be indigent for thirty days before they could send free mail. As discussed in Section V. B, there is no support for the claim that such a policy existed or that Perrino

20

or Jennings were responsible for it. For these reasons, I grant summary judgment for Matthews, Canty, Perrino, and Jennings.

### 2. *Brown*

Plaintiff alleges that C.O. Brown "was constantly refusing to escort the [plaintiff] to his programs" or to a scheduled meeting with the ombudsman of RNDC. Am. Compl. 24. In addition, plaintiff alleges that Brown told another inmate that Brown "would never do the [plaintiff] any kind of favors." Id. Plaintiff does not allege any connection between this conduct and his legal claims, nor can I conceive of any.[15] Because the facts alleged against Brown, even if true, do not state a claim, I grant summary judgment for Brown.

### 3. *Smith*

Plaintiff alleges that Smith, the Inmate Grievance and Request Committee coordinator at GRVC, "failed to have [plaintiff's problems with his] commissary account fixed." Id. at 27. Smith also allegedly failed to identify the R.I.C.C. supervisor and clerks in response to plaintiff's grievances, preventing plaintiff from pursuing the issue further. Id. Finally, plaintiff alleges that Smith refused to grant him a hearing when plaintiff was transferred to another facility at Rikers. Id.; cf. Wingate Dep. 42. These allegations are not enough to state a claim against Smith and, moreover, are unsupported by the factual record. Because no reasonable fact finder could find in favor of plaintiff on this issue, I grant summary judgment for Smith.

### 4. *Padmore*

Plaintiff alleges only that Padmore, also an Inmate Grievance and Request Committee coordinator, "had a set duty to assure compliance to the mail directives [and] the law library directives." Id. at 25. This too fails to state a claim. I therefore grant summary judgment for Padmore.

---

[15] To the extent plaintiff is alleging that Brown refused to escort plaintiff to the law library and therefore impeded his access to the courts, such a claim fails for the reasons discussed in Section I.

# CONCLUSION

For the reasons discussed above, defendants' summary judgment motion is granted in part and denied in part. Specifically, I grant summary judgment to all defendants on plaintiff's access-to-the-courts claim (based on both his mail and library allegations), on plaintiff's deliberate indifference claim stemming from the heat in his cell, and on plaintiff's retaliation claim. Furthermore, I grant summary judgment on all of plaintiff's claims as to the following defendants: Corporation Counsel, the DOC, the City of New York, Perrino, Jennings, Matthews, Canty, Brown, Smith, Padmore, Jenkins, Caldwell, and Burdick. I deny summary judgment as to plaintiff's First Amendment interference-with-mail claim. The sole remaining claim, therefore, is his First Amendment claim against defendants Feaster, Greene, Burke, Wallace, Hall, Stanton, Delaphena, Scully, and Johnson. All other claims and defendants are dismissed.


So ordered.


Date:   August 14, 2018                                      s/ Allyne R. Ross
        Brooklyn, New York                          Allyne R. Ross
                                                    United States District Judge